**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW STRAIT, *et al.*, individually, and on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) | |
| | ) | No. 11 C 01306 |
| v. | ) | |
| | ) | |
| BELCAN ENGINEERING GROUP, INC. d/b/a BELCAN CORP., | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On February 24, 2011, Plaintiff Matthew Strait ("Strait") filed a Complaint, for himself and on behalf of similarly situated others, against Defendant Belcan Engineering Group, Inc. ("Belcan") pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and the Day and Temporary Labor Services Act, 820 ILCS 175/1, *et seq.* (R. 1, Compl.) Plaintiff Scott Brooks ("Brooks") later opted in to this lawsuit. (*See* R. 25-2.) Specifically, Plaintiffs Strait and Brooks (collectively, "Plaintiffs" or "Named Plaintiffs") allege that Defendant Belcan deprived them of an overtime premium for all hours worked in excess of 40 hours in a week. Before the Court are two motions: (1) Plaintiffs' motion for collective and class certification (R. 80, Pls.' Cert. Mot.); and (2) Defendant's motion for partial summary judgment (R. 63, Sum. Jgmt. Mot.). For the reasons explained below, the Court denies Plaintiffs' motion, denies as moot Defendant's motion with respect to the collective and class claims, and grants the remainder of Defendant's motion.

## BACKGROUND

Defendant Belcan is an Ohio corporation and one of the country's largest providers of third-party contracting services of full-service engineering contractors, employing thousands of contractors throughout Illinois and the United States. (Compl. ¶ 1.) Belcan employs dozens or even hundreds of engineers, designers and/or other employees working on outsourced projects. (Undisputed Resp. Facts ¶ 1.)[1] Belcan classifies certain employees as exempt under the FLSA and therefore pays them only straight-time overtime, rather than time and a half, for all hours worked over 40 in a week. (Compl. ¶ 1.) Full-time exempt employees work for customers at more than 20 Belcan facilities and about 30 customer facilities nationwide. (R. 100-3, Pls.' Sum. Jgmt. Opp. Ex. 1, 2011 Wirth Decl. ¶ 6.) Belcan's full-time exempt employees include most internal IT staff, some human resources personnel, many administrative personnel, top-level General Managers and Operations Managers at Belcan locations, Belcan Vice Presidents, engineers and designers. (R. 99-2, Wirth Aug. Decl. ¶ 4)

Plaintiff Strait is currently an employee of Belcan. (Undisputed Facts ¶ 1.)[2] He began working at Belcan in March 2009. (*Id.*) Plaintiff Brooks is a former employee of Belcan, who worked for Belcan from March 19, 2009 to March 18, 2011. (*Id.* ¶ 2.) As explained below, both Strait and Brooks worked as employees at a Caterpillar facility in Aurora, Illinois. (*Id.* ¶ 3.) Belcan classified Strait and Brooks as direct, exempt, full-time employees paid on a salary basis. (*Id.* ¶¶ 7, 9.)

---

[1] Undisputed Resp. Facts refers to undisputed facts in Plaintiff's Additional 56.1 Facts (R. 100-2) and Defendant's Response to Plaintiff's Additional 56.1 Facts (R. 113).

[2] Undisputed Facts refers to undisputed facts in Defendants' 56.1 Statement of Facts (R. 63-4) and Plaintiffs' Response to Defendant's 56.1 Statement of Facts (R. 100-1).

The Court discusses additional facts, where relevant, within the context of the analysis below.

## LEGAL STANDARDS

### I.       FLSA Collective Actions

Pursuant to the FLSA, "employees are entitled to overtime pay (*i.e.*, one and one-half times the regular rate) for any hours worked in excess of forty hours per week, unless they come within one of the various exemptions set forth in the Act." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012) (citing 29 U.S.C. §§ 207, 213). The FLSA "gives employees the right to bring their FLSA claims through a 'collective action' on behalf of themselves and other 'similarly situated' employees." *Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010) (citing 29 U.S.C. § 216(b) (2006)). District courts have broad discretion in managing collective actions under the FLSA. *Id.* at 449.

The Seventh Circuit has not established criteria for determining whether employees are "similarly situated" for purposes of the FLSA, but "'the majority of courts . . . have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action.'" *Franks v. MKM Oil, Inc.*, No. 10 CV 00013, 2012 WL 3903782, *9 (N.D. Ill. Sept. 7, 2012) (quoting *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845 (N.D. Ill. 2008)); *see also Frye v. Baptist Memorial Hospital, Inc.*, No. 11-5648, 2012 WL 3570657, at *3 (6th Cir. Aug. 21, 2012) (recognizing that the second stage warrants a "stricter standard" than conditional certification); *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 533 (3d Cir. 2012) (finding that a more stringent standard applies to final certification compared to conditional certification); *Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010) (recognizing that a two-step method is sensible);

*Camilotes v. Resurrection Health Care Corp.*, No. 10-cv-366, 2012 WL 4754743, at *4 (N.D. Ill. Oct. 4, 2012); *Medina v. Happy's Pizza Franchise, LLC*, No. 10 C 3148, 2012 WL 1094353, *2 (N.D. Ill. Apr. 2, 2012).

At the first stage, a named plaintiff "can show that the potential claimants are similarly situated by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Franks*, 2012 WL 3903782, at *9 (citation and quotation marks omitted); *see also Medina*, 2012 WL 1094353, at *2. At the second stage, however, the court's inquiry becomes more stringent. *Franks*, 2012 WL 3903782 at *9 (citing *Jirak*, 566 F. Supp. 2d at 848); *see also AON Corp. Wage & Hour Employment Practices Litig.*, No. 08 C 5802, 2010 WL 1433314, *5 (N.D. Ill. Apr. 8, 2010) ("The second stage analysis requires the court to employ a much stricter standard in making a final determination on the similarly situated question considering a number of factors including the disparate factual and employment settings of the individuals plaintiffs and the defenses available to defendants that are individual to each plaintiff."). At the second stage, the court considers "'(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns.'" *Franks*, 2012 WL 3903782, at *9 (quoting *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004)). Plaintiffs bear the burden of demonstrating that they are "similarly situated." *See Medina*, 2012 WL 1094353, at *2 (citing *Russell v. Illinois Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010).

Both parties acknowledge that the second stage standards apply to Plaintiffs' certification motion because the parties have completed fact discovery on the issues relevant to this motion. (R. 86, Pls.' Cert. Mem. at 26; R. 99, Def.'s Cert. Opp. at 23); *see also Medina*, 2012 WL 1094353, at *2 ("After discovery is completed and the opt-in plaintiffs are identified, the more stringent second step occurs.").

## II.     Federal Rule of Civil Procedure 23

Federal Rules of Civil Procedure ("Rule") 23(a) contains four prerequisites for class certification: numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011). In addition to satisfying the Rule 23(a) requirements, Plaintiffs must show that the proposed class satisfies one of the three requirements set forth in Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 3d 689 (1997); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Here, Plaintiffs seeks certification pursuant to Rule 23(b)(2) or 23(b)(3). For certification under 23(b)(2), Plaintiffs must show that a single injunction would provide relief to each member of the class. *See Wal-Mart*, 131 S. Ct. At 2557. To certify a class pursuant to Rule 23(b)(3), they must show that "questions of law and fact common to members of the class predominate over questions affecting only individual members of the class" and that the "class action device is superior to other available methods for fairly and efficiently resolving the dispute in question." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 808, 814 n.5 (7th Cir. 2012); *see also* Fed. R. Civ. P. 23(b)(3).

In order to grant class certification under Rule 23, the Court must be "satisfied, after a rigorous analysis" that the rule's requirements are met. *Dukes*, 131 S. Ct. at 2551 (citation

omitted).  Because "'[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action,'" the court's rigorous analysis frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim." *Id.* at 2551-52 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).  Plaintiffs bear the burden of proving each disputed requirement by a preponderance of the evidence.  *Messner.*, 669 F.3d at 811.  District courts have broad discretion in determining motions for class certification.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979); *Messner*, 669 F.3d at 811.

## III.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson*, 477 U.S. at 255 (quotation omitted).  "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility

determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) (internal citations omitted).

## ANALYSIS

### I.     The Court Denies Plaintiffs' Motion for Collective Action

Plaintiffs seek to certify the following collective pursuant to 29 U.S.C § 216(b): "All Full Time Direct Exempt Employees employed by Defendant from June 10, 2008 to present." (Cert. Mot. at 1.)  Plaintiffs never define "Full Time Direct Exempt Employees," however, in their motion for certification or supporting memorandum.  (*See* Pls.' Cert. Mot.; Pls.' Cert. Mem.)  In Plaintiffs' Complaint they seek to certify "all current and former Belcan employees who performed contract or temporary work for Belcan's third-party clients in the United States and did not receive overtime compensation for all hours worked in excess of 40 at any time during the last three years."  (Compl. ¶¶ 32-33.)  Belcan's Exempt Direct-Full Time classification, however, includes administrative personnel who never work on customer projects, meaning that Plaintiffs' request in its motion to certify a collective of "all Full Time Direct Exempt Employees" is potentially broader than the group defined in their Complaint.  (Defs.' Cert. Opp. at 40.)  Plaintiffs' Motion for Judicially Supervised Notice sought to notify "any employee Belcan has classified as a 'Direct' employee that was full time and subject to a policy and/or practice that paid only straight time for hours recorded over 40."  (R. 38, Mot. Jud. Not. at 2.)  In that motion, Plaintiffs claimed, without citation, that Belcan classifies such employees as "Exempt Direct-Full Time."  (*Id*. at 4.)  For purposes of the present motions, the Court assumes that "Full Time Direct Exempt Employees" means all employees that Belcan classifies as "Exempt Direct-Full Time," who are paid only straight time (not time and a half) for hours

7

recorded over 40 each week.

Under the FLSA, an employer must pay every non-exempt employee at "a rate not less than one and one-half times the regular rate at which he is employed" for every hour over 40 that he works each week. *See* 29 U.S.C. § 207. Plaintiffs allege that Belcan has violated the FLSA by not paying Full Time Direct Exempt ("FTDE") employees time and a half for overtime they work. (Compl. ¶ 1.) Belcan counters by claiming that the FTDE employees are exempt from the FSLA overtime requirements under the professional or administrative employee exemptions. (Def's. Cert. Opp. at 21-22.; R. 18, Def.'s Ans. at 18; R. 63, Def.'s Sum. Jgmt. Mot. at 3); *see also* 29 U.S.C. § 213(a).

Proving that an employee qualifies under the professional or administrative employee exemptions requires evidence of the employee's primary job duties along with evidence that the company pays the employee on a salary basis. *See* 29 C.F.R. § 541.300; 29 C.F.R. § 541.200; 29 C.F.R § 541.600. Plaintiffs and Belcan agree, however, that the defining issue of this litigation is whether Belcan pays the FTDE employees on a salary basis. (Pls.' Cert. Mot. at 2; Pls.' Cert. Mem. at 1 ("In this case, there is a common question as to whether or not these employee are paid on a salary basis as required by the FLSA."); Def.'s Cert. Opp. at 21-22; Def.'s Sum. Jgmt. Mot. at 2-3 (arguing that the collective and class claims fail if Belcan pays its exempt employees on a salary basis).) The Court, therefore, only addresses issues relating to the salary basis requirement of the exemptions.

Although Plaintiffs dedicate twenty-two pages of their memorandum supporting their certification motion and nineteen pages of their reply brief to the issue of whether Belcan pays the FTDE employees on a salary basis under the FLSA, the Court need not resolve this issue in

order to reach the question of certification.  (Pls.' Cert. Mem. at 2-24; Pls.' Cert. Reply at 1-20.)

Rather, the issue for certification is whether the Plaintiffs are similarly situated–whether a

common question exists that can be answered without individualized inquiries.  *See* 29 U.S.C.

216(b); *see also* Fed. R. Civ. P. 23(b)(3).  The answer to any common question is a matter for

summary judgment or trial, not for certifying a collective.[3]

Although Plaintiffs are correct that the question "Are Full-Time Direct Exempt

Employees paid a salary?" is common to the entire proposed collective, the universality of that

question does not end the inquiry into whether the proposed collective members are similarly

situated for purposes of certification.  (*See e.g.*, Pls.' Cert. Reply at 1.)  Rather, the Court must

determine whether it can resolve that question based on common inquiries and proof or will need

to conduct individualized inquiries.

The Court, in its discretion, finds that Plaintiffs are situated differently enough that the

Court would need to undertake individualized factual assessments to determine whether Belcan

pays all FTDE employees a salary, as defined by the FLSA.  As such, proceeding as a collective

action is not appropriate.

### A.     The Salary Basis Test

Under the FLSA, an employee is salaried if he "regularly receives each pay period . . . a

predetermined amount . . . which is not subject to reduction because of variations in the quality

or quantity of the work performed."  29 C.F.R. § 541.602(a).  A court deems an employee's pay

"subject to reduction" if the employer either: (1) has an "actual practice of impermissible

---

[3] The Court will resolve the issue of whether Belcan pays Strait and Brooks on a salary basis in Section III when evaluating Belcan's motion for partial summary judgment.

deductions"; or (2) has a "clear and particularized policy" that "creates a likelihood of deduction" and "effectively communicates that deductions will be made in specified circumstances." *Auer v. Robbins*, 519 U.S. 452, 461, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 371 (7th Cir. 2005) ("The phrase 'subject to' does not require proof that an employer has reduced an employee's wages; an employment policy that creates a significant likelihood' of a deduction will suffice."). The Court refers to this test as the "salary basis test."

Notably, not all practices or policies that result in deductions are impermissible under the FLSA. An employer may, for example, deduct an exempt employee's pay if he is absent from work for personal reasons, other than sickness or disability. *See* 29 C.F.R. § 541.602(b)(1). However, "'[i]f an employer docks an employee's pay for partial day absences, violations of rules other than those of safety, or based on the quantity or quality of the employee's work, the employee is not considered to be on a salary basis.'" *Kennedy*, 410 F.3d at 370 (quoting *Piscione v. Ernst & Young, LLP.*, 171 F.3d 527, 534 (7th Cir. 1999).

In light of *Auer*, the Court must evaluate whether common questions and facts will determine whether Belcan has either an "actual practice of impermissible deductions" or a "clear and particularized policy" that "creates a likelihood of deduction" and "effectively communicates that deductions will be made in specified circumstances." *Auer*, 519 U.S. at 461. Rather than framing their argument in such terms, Plaintiffs conflate "actual practices" and "policies" throughout their argument. More troubling, Plaintiffs base their argument on the misconception that either all FTDE employees are salaried and therefore exempt, or none are. (*See e.g.*, Pls.' Cert. Mot. at 2 ("Whether an individual is paid a salary is determined on a

classwide basis."); *see also* (Pls.' Cert. Mem. at 27 ("Whether any individual may be treated as paid on a salary basis can only be determined with reference to the collective").)  Such a contention could be true if Belcan subjected all FTDE employees to a universal policy of improper deductions.  The FLSA, however, does not support Plaintiffs' claim that the Court can conclude that Belcan has an actual practice of impermissible deductions to which *all* exempt employees are subject based on deductions made against some exempt employees.  (*See* Pls.' Cert. Mem. at 27 (arguing that "evidence that some people suffered actual improper deductions (even if others may have not) disqualifies the affirmative defense and does so as to all members of the collective.")).

Under 29 C.F.R. § 541.603(b), all employees with the "same job classification working for the same managers responsible for actual improper deductions" lose exempt status if one such employee faces an improper deduction.  Plaintiffs' proposed nationwide collective, however, encompasses employees with various job classifications, working in multiple cities, under different managers, who utilize different policies and practices for compensating employees.[4]   Under the FLSA, "[e]mployees in different job classifications or who work for

---

[4]  According to uncontested evidence produced by Belcan, Belcan's FTDE employees include most internal IT staff, some human resources personnel, many administrative personnel, top-level General Managers and Operations Managers at Belcan locations, Belcan Vice Presidents, engineers and designers.  (Wirth Aug. Decl. ¶ 4.)  FTDE employees work for customers at more than 20 Belcan facilities and about 30 customer facilities nationwide.  (Pls.' Sum. Jgmt. Opp. Ex. 1, 2011 Wirth Decl. ¶ 6.)  Specifically, Belcan has dozens, or even hundreds of engineers, designers and/or other employees working in its major offices in Cincinnati, Ohio; Palm Beach Gardens, Florida; Indianapolis, Indiana; Peoria, Illinois; Tempe, Arizona; Lexington, Kentucky and elsewhere.  (Pls.' Sum. Jgmt. Opp. Ex. 1, 2011 Wirth Decl. ¶¶ 7-8.)  Belcan employees' expected workweeks are set by the employees and their direct supervisors at these various facilities.  (Wirth Aug. Decl. ¶ 10.)  The employees enter their own time records and supervisors approve those records.  (*Id.*)  Managers have the ability to make decisions regarding FTDE employees' schedules and deductions, including what billing codes

different managers do not lose their status as exempt employees" based upon improper deductions that one employee experiences. *Id.* Plaintiffs' argument that "if Belcan intends to pay members of the collective on an hourly basis or if members of the collective are subject to improper deductions . . . then ***every member of the collective*** has been misclassified and Belcan is required to pay overtime premiums to all, including those who may not have been individually affected by the policy or practice" is, therefore, inaccurate outside of a showing that Belcan has a nation-wide policy affecting all members of the collective. (Pls.' Cert. Mem. at 27 (emphasis in original)); *see also Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008) (finding plaintiffs' argument that "that because some Com Ed employees may sometimes do some work at lunch, all Com Ed employees are entitled to pay during their lunch break" to be "preposterous").

As explained below, determining whether Belcan either has an actual practice of improper deductions or subjects all FTDE employees universally to a nation-wide policy would require a detailed, fact-based inquiry not appropriate for the collective mechanism.

**B.** **Factual and Employment Setting Differences Relevant to Belcan's Exemption Defense Undermine the Collective Action Procedure**

To proceed as a collective action, Plaintiffs must "'demonstrate[] similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present.'" *Russell*, 721 F. Supp. 2d at 812 (quoting *Vennet*

_____

they use, how to handle holidays, whether employees can work when a client site is closed, and whether to recoup any vacation time upon employees' termination or status change. (Wirth Aug. Decl. ¶¶ 7, 10, 17, 19; R. 99-3, Taylor Decl. ¶ 7; R. 99-4, Meyers Decl. ¶¶ 7-11; R. 99-5, Powell Decl. ¶¶ 7-12; R. 99-6, Young Decl. ¶¶ 7-10; R. 99-7, Golden Decl. ¶¶15-17.)

*v. Am. Intercont'l Univ. Online*, No. 05-4889, 2005 WL 6215171, at *6 (N.D. Ill. Dec. 22, 2005)). A collective action is not appropriate when determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry. *See Alvarez*, 605 F.3d at 449. Plaintiffs, however, need not be identically situated, only similarly situated. *See Russell*, 721 F. Supp. 2d at 812 (citing cases).

In analyzing a plaintiffs's factual and employment settings, courts typically consider such factors as location, job duties, supervision, and policies or practices that bind the plaintiffs' claims together. *See e.g., Camilotes,* 2012 WL 4754743, at *4*; Cottle v. Falcon Holdings Mgmt., LLC.,* No. 11-CV-95, 2012 WL 4243644, at *10 (N.D. Ill. Sept. 20, 2012); *Espenscheid v. DirectSat USA, LLC*., No. 09-cv-625-bbc, 2011 WL 2009967, at *6 (W.D. Wis. May 23, 2011); *Jonites v. Exelon Corp.,* No. 05 C 4234, 2006 WL 2873198, at *3 (N.D. Ill. Oct. 4, 2006); *Schultz v. American Family Mut. Ins. Co.,* No. 04 C 5512, 2005 WL 5909003, at *2 (N.D. Ill. Nov. 1, 2005); *Mielke*, 313 F. Supp. 2d at 762-63. These factors weigh against collective action in this case because determining whether a Plaintiff has a viable claim will require detailed and individualized factual inquiries, and those individualized issues will predominate over any issues that are common to the class. *See Alvarez*, 605 F.3d at 449. Specifically, the differences in the FTDE employees' work environments, work locations, billing practices, use of vacation time, and managers will impact the Court's analysis of whether Belcan pays all FTDE employees a salary rather than an hourly wage.

### 1. Determining Whether Belcan Has an Actual Practice of Impermissible Deductions For All FTDE Employees Requires Individualized Inquiries

As discussed above, the Court cannot find that *all* collective members are not exempt simply by finding that Belcan has improperly reduced the salary of some FTDE employees. Rather, the Court will need to conduct numerous inquiries into deductions taken by each different manager for employees of each different job classification as FTDE employees work in different jobs, in different locations across the nation, under various managers. *See* 29 C.F.R. 541.603(b) ("[T]he exemption is lost during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions").  Plaintiffs have failed to establish by a preponderance of the evidence that Belcan applies the same deductions across the board for all FTDE employees.  The inquiry into whether Belcan utilizes an actual practice of impermissible deductions, therefore, is individualized rather than collective.  *See e.g.*, *Jonites*, 522 F.3d at 725-26 (refusing to certify a collective that was "hopelessly heterogenous" based on different meal period practices); *Camilotes,* 2012 WL 4754743 at *5-11 (finding that plaintiffs who worked at eight different hospitals in 198 different departments with different managers employing different practices regarding real breaks created too many factual disparities for collective action).

### 2. Plaintiffs Have Not Identified a Nation-wide Clear and Particularized Policy that Creates a Likelihood of Deduction and Effectively Communicates that Belcan Will Make Impermissible Deductions in Specified Circumstances

Although Plaintiffs argue that multiple universally applicable Belcan policies support collective action, Defendants have submitted evidence demonstrating that managers and

14

supervisors differ in how they implement the various policies at issue. As outlined below, Defendants offer undisputed evidence that different managers in different locations use varying practices regarding how employees account for their time, utilize vacation time, receive deductions for vacation time, and manage days with less than 8 hours of billable work, particularly depending on whether the manager oversees employees working in a Belcan office or a client site. Plaintiffs' arguments therefore fail because the alleged policies are not nation-wide and would require individualized factual inquiries to determine if any improper deduction occurred.

The Court addresses each of the various policies that allegedly remove FTDE employees from the FLSA professional or administrative employee exemption in turn. Plaintiffs argue that Belcan fails the salary basis test based on the following policies.

### a. Negative Vacation and Leave Without Pay Theories

Although Plaintiffs discuss their "negative vacation" and "leave without pay" theories separately, each fails to support collective action for similar reasons. Specifically, Plaintiffs base both theories on the assumption that Belcan forces its employees to take negative vacation days[5] or leave without pay days on days that a client closes its site or there is no work. Plaintiffs argue that such action would violate the FLSA's requirement that an employer pay an exempt employee full salary any time he is "ready, willing and able to work." 29 C.F.R. §541.602(a). As discussed below, however, Belcan has submitted uncontested evidence that not all FTDE employees are "subject to" these policies as local managers and supervisors manage these issues.

---

[5] Negative vacation days are vacation days that an employee takes but has not yet accrued during his employment.

### i. Policies in Belcan's Employee Handbook

Under the "negative vacation" theory, Plaintiffs argue that Belcan pays FTDE employees hourly because policies in its Employee Handbook provide for "negative vacation accruals" and Belcan in fact "recoups" negative vacation time that the employees use but never accrue. (Pls.' Cert. Mem. at 7.) Specifically, Plaintiffs cite two Belcan policies which state that, in the event an employee leaves the company or an employee's status changes from full time to part time, the company will deduct from the employee's last paycheck any vacation time in excess of the amount to which the employee is entitled. (Pls.' Cert. Mem. at 7-8; Pls.' Cert. Mem. Ex. 8, Handbook Excerpts at BE00059-60, BE00062-63, BE00065-66.) Plaintiffs argue that such a deduction violates the FLSA because Belcan forces employees to take a negative vacation day, thereby risking a deduction later, because of lack of work. *See* 29 C.F.R. § 541.602(a).

To support the "leave without pay" theory, Plaintiffs cite to the "Working Hours" policy in the Employee Handbook. (Pls.' Cert. Mem. at 12-13.) This policy states:

> When working off-site, the normal working hours to be observed are the working hours of that facility. In the event that the facility has a holiday that is not a Belcan scheduled holiday, if you do not perform work for Belcan during that day, then the time-off is not compensated unless compensated as vacation.

(Pls.' Cert. Mem. Ex. 9, Handbook Excerpts at BE00041, BE00053.) Plaintiffs argue that this policy "is clear that [Belcan] will not pay for time not actually worked or will otherwise deduct from vacation pay where the employee cannot work because of a client holiday." (Pls.' Cert. Mem. at 12.) Plaintiffs again argue that this deduction improperly stems from a lack of work rather than a choice to take a vacation day.

Similarly, Plaintiffs cite to Belcan's "Compressed Work Week" policy in the Employee Handbook for the proposition that Belcan improperly deducts employee pay for partial days by

forcing employees to work a "compressed work week" during holidays or by forcing employees to take unpaid time off when there is no work for the employee. (Pls.' Cert. Mem. at 11-18.) That policy states:

. In general, the compressed work week will mean that you will work 30 hours during the 3 days the Company is open for that week. By working 30 hours during that week, you will be paid a total of 40 hours which includes 10 hours for the holiday (30 hours worked/paid including the holiday earns 10 holiday hours). Exempt full-time employees not wanting to work extended hours during the compressed work week may take a day off without pay or as a paid vacation day. The election to take an unpaid day off or to use vacation in lieu of extended hours is strictly voluntary. Non-exempt employees working less than 30 hours will be paid for actual hours worked plus the regular 8 hour holiday.

(Pls.' Cert. Mem. Ex. 7, 2012 Handbook Excerpt at internal 38.)

As a threshold issue, Plaintiffs improperly rely on the fact that all three of these policies appear in the Belcan Employee Handbook to establish that all exempt employees are "subject to" these policies. Indeed, Plaintiffs mistakenly conflate whether Belcan distributes a policy to exempt employees with whether FTDE employees are "subject to" an impermissible policy under the FLSA. (*See e.g.*, Cert. Reply at 5 ("To say that the policy applies to both exempt and non-exempt employees is an admission that a subject of that group, FTDE employees are all bound by that handbook.").) As explained below, because Belcan distributes the Employee Handbook to exempt and non-exempt employees alike, and these policies do not specifically state to which employees they apply, the Court cannot conclude, without more, that any exempt employee is "subject to" these policies. (Wirth Aug. Decl. ¶ 8); *Auer*, 519 U.S. at 461-62.

As previously explained, under the salary basis test, an employee is "subject to" a reduction based on a policy only if the policy is clear and particularized, creates a likelihood of deduction, and effectively communicates that deductions will be made in specified circumstances. *Auer*, 519 U.S. at 461-62. The Supreme Court held in *Auer* that a policy manual

that "nominally" covers all employees does not "effectively communicate" that employees in the relevant category will likely face pay deductions because it is perfectly possible that such penalties apply to the non-salaried employees whom the manual also covers. *Id.* Here, as in *Auer*, the company distributes the Employee Handbook to exempt and non-exempt employees alike and there is no indication on the face of the cited policies that the allegedly improper deduction would befall any exempt employee. (Wirth Aug. Decl. ¶ 8) Indeed, the "Working Hours" policy does not even reference any type of salary reduction, let alone "clearly articulate" that there is a "significant likelihood" that an exempt employee will have his salary improperly reduced. *Id.* Rather, the policy states that if an employee does not do work for Belcan, despite the client site being closed, he will not be compensated for that day, which does not violate the FLSA on its face. (Pls.' Cert. Mem. at 12-13; Pls.' Cert. Mem. Ex. 9, Handbook Excerpts at BE00041, BE00053); *see Ottaviano v. Home Depot, Inc. USA*, 701 F. Supp. 2d 1005, 1009 (N.D. Ill. 2010); *Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066, 1070 (7th Cir. 1997) (finding that a company may require a salaried employee to make up missed time from work to receive full salary).

Notably, though its holding is not binding on this Court, the court in *O'Donnell v. Robert Half Intern., Inc.* refused to even conditionally certify a collective based on a vacation time argument similar to Plaintiffs. 534 F. Supp. 2d 173, 180-81 (D. Mass. 2008). In *O'Donnell*, the company handbook stated that an employee could take a partial-day off on borrowed time and then incur a deduction from his final paycheck if the company terminated him before earning that time back. *Id.* The court found that such a policy did not "amount to an employment policy that creates a 'significant likelihood' of impermissible deductions." *Id.* at 181. Specifically, the

court reasoned that "[a]lthough the Handbook allows [the company], by virtue of three separate provisions and events, eventually to deduct pay from a salaried employee for a partial-day absence, it does not communicate that such deductions will, in fact, be made." *Id.*

Similarly, in *Kennedy*, the Seventh Circuit found that a purported policy that contemplated the possibility of an employee choosing to take a day off without pay during a snow storm, but did not state that it would reduce an employee's salary for failing to make it to work, did not constitute a policy creating a "significant likelihood" of a deduction. *See Kennedy*, 410 F.3d at 371; *see also DiGiore v. Ryan*, 172 F.3d 454, 462 (7th Cir. 1999) (finding that a "theoretical possibility of an impermissible pay deduction is not enough"). Plaintiffs' claim that "If policies might result in an inappropriate deduction, the salary basis test is failed," is, therefore, inconsistent with the law. (Pls.' Cert. Mem. at 6.)

As a result, universal distribution of these Employee Handbook policies undermines Plaintiffs' argument that Belcan subjects exempt employees to them. *Auer*, 519 U.S. at 461-62. The fact that Belcan's Employee Handbook includes a section forbidding impermissible deductions for exempt employees further undercuts Plaintiffs' argument. (R. 65, Wirth May. Decl. ¶¶ 4-8 and Ex. A at BE00044, Ex. B at BE00049-50, Ex. C at BE00055-56, Ex. D at internal 52.)

Additionally, as explained below, Belcan has submitted uncontested evidence to undermine the theory that Belcan applies these policies universally. In fact, Plaintiffs even acknowledge that Belcan does not always implement the policies in the Employee Handbook, stating that "[t]he material in this handbook is specifically contrary to Belcan's policies and practices." (R. 100-1, Pls.' 56.1 Resp. ¶¶ 17, 18.) As explained below, Belcan has submitted

uncontested evidence that it is the local managers and supervisors who decide if and how to implement these policies. As a result, determining whether Belcan made any improper deduction will require an inquiry into the practices each local manager and supervisor implements.

Furthermore, under the FLSA, Belcan may not deduct pay from an employee based on lack of work but may legitimately deduct an exempt employee's pay if he misses time for "personal reasons." 29 C.F.R. §541.602(a); 29 C.F.R. 541.602(b)(1). To determine whether a deduction was improper, therefore, will require an individualized fact inquiry into why each employee took a vacation day or a leave without pay day, including whether there was work available on that day and whether the employee took a day for personal reasons.

The issue of whether an employee had the ability to work on a client-based holiday is highly individualized as Belcan has presented undisputed evidence that different managers at different client sites handle client holidays differently. According to declarations from various Belcan managers, if there is a lack of work or the client closes its site, local managers and supervisors provide options for employees to still account for 40 hours of time. (Meyers Decl. ¶¶ 7, 10; Powell Decl. ¶¶ 7-12; Young Decl. ¶¶ 6-8, 10; Golden Decl. ¶¶ 6, 13-16.) Some local managers and supervisors, for example, handle work shortages by having employees use paid "overhead" codes when there is not enough billable work. (Powell Decl. ¶ 12; Young Decl. ¶¶ 10; Golden Decl. ¶ 16.) According to various Belcan managers, when a client closes its site, employees can work remotely, can sometimes access the client site even on client-based holidays, can work at a Belcan office, or can work for another customer. (*See* Golden Decl. ¶¶ 15-16; Meyers Decl. ¶¶ 7, 10, 11; Powell Decl. ¶¶ 7-8, 10-12; Young Decl. ¶¶ 8-10.) Managers

also may give an employee access to a Belcan office on the weekend if the client is closed for business from the general public. (R. 66, Meyers May Decl. ¶ 5.) Indeed, even Strait testified that he had a choice of whether to work longer days, work on a Saturday, or work at a different location when his client-site closed for a non-Belcan holiday. (Pls. Cert. Mem. Ex. 17, 52:19-23.) Notably, such a choice does not undermine an employee's exempt status. *See e.g., Kennedy*, 410 F.3d 365 at 371 ("Being given the choice to make up the time lost is not the same as having a policy that imposes deductions for failing to show up").

Additionally, there is undisputed evidence that the manager or direct supervisor has discretion whether to alter an employee's work schedule to three or four 10-hour days or to include a Saturday, therefore avoiding the need for employees to log any vacation time. (Wirth Aug. Decl. ¶ 10; Pls.' Sum. Jgmt. Opp. Ex. 17 at 52:19-23); *see also* (Pls.' Cert. Mem. Ex. 7, 2012 Handbook Excerpt at internal 37, and Ex. 8, Handbook Excerpts at BE00063 ("Alterations to the schedule on an employee-by-employee basis and access to the facility on days the Company is closed are at the discretion of the site General Manager and your direct supervisor.").) In fact, contrary to Plaintiffs' arguments, Belcan managers from across the country have declared that they, and those whom they supervise, have a personal policy not to ask exempt employees to use negative vacation. (Meyers Decl. ¶ 8; Young Decl. ¶ 9; Golden Decl. ¶ 13; Powell Decl. ¶ 6.) Belcan managers at some locations also have input over whether Belcan recoups an employee's negative vacation balance, creating another potential factual difference between employees working for different managers. (Golden Decl. ¶ 17; Wirth Aug. Decl. ¶ 17.) Belcan also raises the factual issue that some employees receive only holiday pay during their final week, therefore any vacation recoupment comes from gratuitous holiday pay

and is not a deduction from salary for any week they worked.  (Def. Cert. Opp. Mem at 4; Taylor Decl. ¶ 7.)

Moreover, most exempt Belcan employees who work on customer projects actually work from Belcan facilities, so are not affected by customer-only holidays or closures, further factually differentiating certain exempt employees from others.  (Pls.' Sum. Jgmt. Opp. Ex. 1, 2011 Wirth Decl. ¶¶ 11-12; Wirth Aug. Decl. ¶ 4 (stating that, at any given time, approximately 80% of Belcan employees are not stationed at a client site).)  Employees also may work on a customer site at some times but not others, depending on the customer's needs.  (Wirth Aug. Decl. ¶  4.)  Each employee's experience with client-only holidays is different, therefore, as some may never face this issue, some may face it during certain holidays, and some may face it for every client-based holiday throughout the year.  These differences weigh against collective action.

Rather than offering documents, affidavits or testimony to contradict the numerous declarations from Belcan managers from different states that they have different ways that they handle client-holidays and negative vacation, Plaintiffs cite individual instances and inconclusive data compiled by their attorney based on Belcan's records.  Plaintiffs' reliance on such individual data is misplaced because, if anything, it would establish an actual practice of a deduction for that particular employee, rather than a universal policy, as Plaintiffs argue. Plaintiffs cite, for example, data to show that some employees took a leave without pay day during certain weeks where a client had a non-Belcan holiday.  (*See e.g.,* Pls.' Cert. Mem. at 17-18.)  This data cannot explain why the employee took the leave without pay day, namely whether it was a voluntary choice or because of lack of work.  Similarly, Plaintiffs give a fact-specific

example of an employee who allegedly had a vacation day recouped after being forced to use a vacation day because one particular client, Pratt & Whitney, closed its site in Connecticut for Good Friday in 2009. (Pls.' Cert. Mem. at 12.) Plaintiffs do not, however, link this fact-specific instance to any uniform policy or a practice implemented by managers at other locations. Moreover, even if this data proved that Belcan improperly deducted pay from those particular exempt employees, it does not mean that *all* exempt employees were "subject to" an improper deduction.

Furthermore, Plaintiffs do not differentiate between exempt and non-exempt employees when citing to Belcan data, which is particularly problematic since an employee's status can change. Plaintiffs state, for example, that "partial day recoupment occurred no less than 693 times and affected 144 employees between January 2008 - January 2012," without explanation of whether the cited employees were exempt or non-exempt employees when they took the vacation, whether these employees worked on- or off-site, in what city these employees worked or for what managers they worked. (Pls.' Cert. Mem. at 11.) At best, Plaintiffs' data shows that certain individual employees suffered a deduction, which, as previously explained, does not mean that Belcan subjected all FTDE employees to an actual practice of deductions. Plaintiffs' data, therefore, does not undermine or contradict the declarations and evidence presented by Belcan that local managers and supervisors implement policies and practices in different ways. These local differences undercut Plaintiffs' arguments for collective treatment.

Each of the above factual differences and localized practices, which Plaintiffs do not dispute, undermines Plaintiffs' arguments that the Court can resolve the salary issue with a common inquiry. Ultimately, when "[a]lleged violations stem[] from the enforcement decisions

of individual supervisors, without a company-wide policy or plan directing those enforcement decisions, collective treatment is not appropriate." *Adair v. Wis. Bell, Inc*., No. 08-CV-280, 2008 WL 4224360, at *7 (E.D. Wis. Sept. 11, 2008); *see also Beauperthuy v. 24 Hour Fitness USA, Inc*., 772 F. Supp. 2d 1111, 1124 (N.D. Cal. 2011) (rejecting certification when decisions on how many hours each employee could work and be paid for was on a fitness club-by-club basis, typically by a manager at each club); *Kuznyetsov v. West Penn Allegheny Health Sys.,Inc.*, No. 10-948, 2011 WL 6372852, at *5 (W.D. Pa. Dec. 20, 2011) (finding the fact that supervisors had the authority to "dictate how and when or if meal breaks were scheduled and the method of reporting a missed meal break . . . exponentially compounds the differences and individualized experiences that go to whether there was a violation of the law, rather than creating consistency"); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:10-CV-592-FDW-DSC, 2011 WL 4351631, at *7-8 (W.D. N.C. Sept. 16, 2011) ("[w]hen alleged FLSA violations stem from the enforcement decisions of individual supervisors, without a company-wide policy or plan directing those enforcement decisions, collective treatment is not appropriate"); *Reed v. Cnty of Orange*, 266 F.R.D. 446, 450 (C.D. Cal. Jan. 8, 2010) (observing that "[d]ecertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors").

### ii.     Policies Articulated Outside of the Handbook

In addition to the Employee Handbook policies discussed above, Plaintiffs cite two other allegedly improper policies.  Both of these policies fail to support collective action.

To support their "leave without pay" theory, Plaintiffs point to an email attachment discussing the use of a leave without pay billing code (code 780) used for time taken off for (1)

personal reasons; (2) days employees volunteer not to work during work shortages; or (3) client holidays that employees choose to work without pay. (Pls.' Cert. Mem. at 15.) First, contrary to Plaintiffs' unsupported assumption that the policy applies to all FTDE employees, this email attachment was distributed only to supervisors of employees who worked on projects for Caterpillar, not nationwide. (Meyers Decl. ¶¶ 13-14; Young Decl. ¶¶ 12-13.) Second, even if the Court determined that Belcan could not properly deduct pay for one of these categories, and even if Plaintiffs showed that this was a nation-wide policy–which they have not–the Court would need to individually determine for which of the three reasons each employee utilized the 780 billing code. This purported policy, therefore, raises individualized questions, not collective issues.

Plaintiffs also cite to a Belcan Onsite Employee Expectations PowerPoint presentation distributed June 17, 2011 regarding employee options for holidays not observed by Belcan. (Pls.' Cert. Mem. at 14, Ex 3.) This PowerPoint cannot form the basis of Plaintiffs' claims as it is not a nation-wide policy. Belcan gave this presentation only for employees who were managed out of Peoria, Illinois who worked on Caterpillar projects at Caterpillar sites within Belcan's Heavy & Industrial Equipment Division. (Meyers Decl. ¶ 12; Young Decl. ¶ 11.) Indeed, the email to which the PowerPoint was attached was sent to only a few supervisors. (Pls.' Cert. Mem Ex 3.) Even if this was a nation-wide policy, it specifically indicates that employees and managers have options about how to mange holidays not observed by Belcan. Specifically, the presentation states that employees have flexibility to choose to work "per Belcan manager approval" if they can access the site, or, if they cannot access the site, to work either four 10-hour days, take a day off without pay or a vacation day, after notifying their

supervisor of their individual plans.  (Pls.' Cert. Mem. at 14, Ex 3.)  The policy, therefore, undermines the argument for collective action as it indicates that different employees can make different choices and that managers may handle such holidays differently.

Because Plaintiffs cannot base a collective action on a policy that would require individualized factual inquires into the local practices of each manager or at each client site, their "negative vacation" and "leave without pay" theories fail.

### b.        Furlough Adjustment

Plaintiffs' arguments regarding Belcan's "furlough adjustment" also do not relate to the potential collective as a whole or any nation-wide policy and therefore fail to support collective action.  (Pls.' Cert. Mem. at 18.)

In early 2009, two of Belcan's clients cut days from their work schedule to counter the downturn in the economy.  (Pls.' Cert. Mem. Ex.  4; Wirth Aug. Decl. ¶ 19; Golden Decl. ¶¶ 8-11;  Pls.' Sum. Jgmt. Opp. Ex. 6 at BE19780-81).  Plaintiffs argue that Belcan "manipulated its accounting by paying FTDE employees on the furlough days, but then deducting the same weekly amount from their salary over the next nine months."  (Pls.' Cert. Mem. at 18.)  Whether Belcan did in fact "manipulate its accounting" as alleged, it is uncontested that such action was temporary and in response to a specific circumstance created by two clients and therefore did not similarly affect the proposed collective members.  Even if the Court found that such a policy undermined the affected FDTE employees' status, Plaintiffs acknowledge that the "furlough adjustment" was not a nation-wide or pervasive policy affecting the entire collective.  (*See e.g.*, Pls.' Cert. Mem. at 18 ("In early 2009, two of Belcan's clients cut five days from their work schedule "as a result of unprecedented economic challenges.").)  As noted above, this "furlough

adjustment" only affected FDTE employees who worked at two specific clients in 2009. Plaintiffs' "furlough adjustment" theory, therefore, does not support nation-wide collective action.

### c.    Payroll Anomalies

Plaintiffs also argue that certain "payroll anomalies" establish that Belcan paid its employees by the hour.  First, Plaintiffs argue that Belcan's practice of paying employees who bill less than 40 hours of billable work straight-time overtime[6] shows that Belcan only compensates employees for hours worked.  Specifically Plaintiffs cite an employee whom Belcan paid for 33.5 hours when he worked 32 hours, took 8 hours of paid leave, and worked 1.5 hours of straight time overtime.  (Pls.' Cert. Mem. at 22.)  According to Plaintiffs, this data shows that Belcan intends to pay employees based on the number of hours they work as this employee received compensation for 33.5 hours rather than his weekly salary.  (*Id*.)  Plaintiffs do not cite, however, to any specific policy articulating this anomaly, conceding instead that this is a pay "practice."  (Pls.' Cert. Reply at 11.)  As previously discussed, in order to establish that Belcan subjects all FTDE employees to an actual practice, the Court would need to undergo a highly-individualized inquiry about the practices of each manager for each classification of employee.  *See* 29 C.F.R. 541.603(b).  This alleged anomaly, therefore, does not justify collective action.

Second, Plaintiffs argue that Belcan's "Employment Status Change" policy indicates that Belcan intends to pay its employees by the hour.  (Pls.' Cert. Mem. at 23-24.)  The Employment

---

[6] Straight time overtime means that an employee is paid his effective hourly wage for those hours, rather than time and half.

Status Change policy states:

> Employment status change is to be used if a full time employee(s) is needed on a weekly basis but not enough hours to sustain 40 hours per week. A temporary employment status change can be made to change their employment to Part-time 30+ or Part-time <30. Their status change should remain the same until it is determined by management that the employee can sustain 40 hours of employment for a duration of time.

(Pls.' Cert. Mem. Ex. 7 2012 Handbook Excerpt at internal 49.)  This policy, however, does not communicate that any kind of deduction will be made from an exempt employee's salary. Rather, it articulates a policy of changing an employee's status as the workload dictates. Moreover, Plaintiffs even concede that Belcan pays part-time non-exempt employees an overtime premium (time and a half) if they work more than 40 hours, which is in line with the requirements of the FLSA.  (Pls. Cert. Mem. at 23.)  Plaintiffs further concede that this policy does not "violate[] the salary basis test in and of itself."  (Pls.' Sum. Jgmt. Reply at 12.)  This policy, therefore, cannot form the basis for a collective based on exempt employees not receiving proper overtime pay.

### d.      Named Plaintiffs Are Not Similarly Situated

As discussed further in Section III, even when evaluating the evidence in the light most favorable to Plaintiffs, there is no factual dispute that Belcan paid Brooks and Strait on a salary basis.  Specifically, Plaintiffs have failed to identify sufficient evidence that Strait or Brooks had any negative vacation recouped from their pay, were forced to take leave without pay, or had their pay adjusted under the "furlough adjustment," despite basing their arguments for collective action on these theories.  Because Plaintiffs base their collective allegations on the argument that the employees do not qualify as exempt employees from the overtime provisions of the FLSA because Belcan does not pay them on a salary basis, Brooks and Strait are not similarly situated

to the rest of the proposed collective.

      **C.**      **Fairness and Procedural Considerations**

In addition to evaluating the factual and employment setting differences relevant to Belcan's exemption defense, the Court considers whether proceeding as a collective would create fairness or procedural benefits. *See Franks,* 2012 WL 3903782 at *9; *Mielke*, 313 F. Supp. 2d at 762. Due to the myriad of individualized factual issues discussed above, this third factor also weighs against collective action. *See White v. Baptist Memorial Health Care Corp.*, No. 08-2478, 2011 WL 1883959, at *14 (W.D. Tenn. May 17, 2011) ("Because [the plaintiff] has not shown that the Opt-in Plaintiffs are similarly situated ..., there is no judicial economy to be gained by allowing their claims to proceed collectively. The only possible results are unfairness to [the defendant] and manageability problems for the Court.").

The diverse working environments and compensation experiences of the proposed collective and the lack of universal Belcan policies undercut any efficiency or cost-saving arguments as the collective will not be able to rely upon meaningful collective proof. *See Camesi v. Univ. of Pitt. Med. Ctr.*, No. 09-85J, 2011 WL 6372873, at *9 (W.D. Pa. Dec. 20, 2011) (explaining that the court could not view the plaintiffs' desire to litigate collectively as the "only consideration," but must "balance the reduced litigation costs to individual Plaintiffs with the potential effects that final certification may have on the fairness of the adjudication and the interests of manageability and judicial efficiency") (citing *White*, 2011 WL 1883959 at *13)). The location where each employee worked, whether he worked for a client, whether he worked at a client site or Belcan office, whether he was furloughed, under what circumstances he took vacation days, whether he had vacation time recouped, and what policies and practices his

29

supervisor instituted regarding unpaid days off all will impact whether Plaintiffs can recover for overtime under the FLSA. Moreover, these various combinations of circumstances which affect the diverse proposed collective members undermine the ability of the Named Plaintiffs to present representative testimony on their behalf, particularly in light of the fact that, as outlined further in Section III, both Named Plaintiffs are exempt under the FLSA.

For the foregoing reasons, the Court denies Plaintiffs' motion to certify a collective action under the FLSA.[7]

## II.    The Court Denies Plaintiffs' Motion to Certify Under Rule 23

In addition to FLSA claims, Plaintiffs allege violations under the Illinois Minimum Wage Law ("IMWL"). To pursue these claims, Plaintiffs seek to certify the following class under Rule 23: "All Full Time Direct Exempt Employees employed by Defendant in Illinois from February 24, 2008 to present." (Pls.' Cert. Mot. at 1.) To be entitled to class certification, a plaintiff must satisfy each requirement of Rule 23(a)–numerosity, commonality, typicality, and adequacy of representation–and one subsection of Rule 23(b). *See Amchem*, 521 U.S. at 614; *see also G.M. Sign, Inc. v. Brink's Mfg. Co.,* No. 09 C 5528, 2011 WL 248511, at *3 (N.D. Ill. Jan. 25, 2011) (citing *Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 513 (7th Cir. 2009)).

The IMWL includes exemptions for professional and administrative employees "as defined and covered by the Federal Fair Labor Standards Act of 1938." *Zelenika v. Commonwealth Edison Co.*, No. 09 C 2946, 2012 WL 3005375, 14 (N.D. Ill. July 23, 2012) (citing 820 ILCS 105/4a(2)(E)). Additionally, the elements of Plaintiffs' IMWL claim are the

---

[7] Because the Court denies Plaintiffs' motion, the Court need not address Plaintiffs' request to toll the statute or limitations or expedite discovery as it is moot. (Pls.' Cert. Mem. at 29-32.)

same as their FLSA claim, since the IMWL claim incorporates the FLSA regulations by reference.  For largely the same reasons that Plaintiffs' FLSA claim does not warrant collective treatment, therefore, the Court also declines to certify Plaintiffs' IMWL claim under Rule 23.  Specifically, Plaintiffs have not met their burden of showing that common questions of law and fact predominate over individualized factual inquiries under Rule 23(b)(3), nor that a single injunction and common damages would suffice under Rule 23(b)(2).  Although Plaintiffs' Rule 23 class is narrower than their FLSA class as it includes only employees in Illinois, diverse circumstances still face the potential class members regarding what customers they worked for, whether they worked on- or off-site, whether they took any vacation days, whether Belcan recouped any negative vacation days, and what practices their managers and supervisors employed regarding unpaid or voluntary leave.

Plaintiffs fail to demonstrate that the Strait and Brooks have claims typical of the rest of the class.  *See* Fed. R. Civ. P. 23(a)(3).  The typicality element broadly requires "that the claims or defenses of the representative party be typical of the claims or defenses of the class."  *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (quoting *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000)).  Contrary to Plaintiffs' claims that Strait and Brooks are "paradigmatic" of the class, as discussed below in Section III, even viewing the evidence in the light most favorable to Plaintiffs, there is no dispute that Belcan paid Strait and Brooks on a salary basis.  (Pls.' Cert. Mem. at 35.)  Indeed, Plaintiffs have conceded that if Belcan pays its exempt employees on a salary basis, then "clearly individual issues predominate" in this case and "it's not appropriate for certification." (R. 64, Hankinson Decl. Ex. 4, Mar. 20, 2012 Status Tr. at 2:14-23.)  Additionally, as discussed above, the issues relevant to the salary basis test vary

based on an employee's work location and manager.  Because Belcan and Strait have worked in only a single department at an Aurora client facility, they would not represent claims typical to FTDE employees at other facilities.

Plaintiffs also fail to establish sufficient commonality among the issues facing their proposed class members.  "Here Plaintiffs claim a misclassification based upon failure of Defendant to meet the salary basis test."  (Pls.' Cert. Mem. at 35.)  Plaintiffs argue that Belcan passes or fails the salary basis test for the class as a whole, failing again to recognize that an employee is not "subject to" a reduction under the FLSA simply because other exempt members face such an impermissible deduction.  Rather, as explained above, the question is whether Belcan has an actual practice of making deductions against employees in the same job classification under the same manager or a nation-wide impermissible policy.  29 C.F.R. § 541.603(b).  The Court, therefore, agrees with Belcan that it is not enough, for commonality purposes, for Plaintiffs to rely on the fact that all prospective class members are classified as exempt and therefore do not receive an overtime premium.  (Def's. Cert. Opp. at 32 ("If that were enough, then every FLSA challenge to an exempt classification would satisfy "commonality" for all exempt employees - an absurd result that obviates that rule.").

"Although related to Rule 23(a)'s commonality requirement, 'the predominance inquiry is far more demanding.'"  *Ross v. RBS Citizens, N.A.*, No. 09 CV 5695, 2010 WL 3980113, at *6 (N.D. Ill. Oct. 8, 2010) (citing *Pavone v. Aegis Lending Corp.*, No. 05-c-1529, 2006 WL 2536632, at *4 (N.D. Ill. Aug. 31, 2006) (quoting *Amchem*, 521 U.S. at 623-24)).  Indeed, even Plaintiffs acknowledge that Rule 23(b)(3)'s predominance requirement is more stringent than the "similarly situated" requirement under § 216(b).  (Pls.' Cert. Mem. at 25); *see also Camilotes,*

2012 WL 4754743; *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996). Because Plaintiffs have failed to meet their burden to show that they are "similarly situated" for purposes of § 216(b), they have also failed to demonstrate, by a preponderance of the evidence, that common issues predominate over individual issues for their IMWL claim under Rule 23(b).

"To satisfy this aspect of Rule 23(b)(3), the plaintiff must show that common issues not only exist but outweigh the individual questions. The common questions must be central to all claims." *Ross,* 2010 WL 3980113 at *6. As the Seventh Circuit recently stated, "[t]here is no mathematical or mechanical test for evaluating predominance." *Messner*, 669 F.3d at 814 (citing 7AA *Wright & Miller, Federal Practice & Procedure* ("Wright & Miller") § 1778 (3d ed. 2011)). The predominance "'inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy,' with the purpose being to determine whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation." *Id.* (quoting *Amchem*, 521 U.S. at 623). The predominance requirement "is satisfied 'when common questions represent a significant aspect of [a] case and ... can be resolved for all members of [a] class in a single adjudication." *Messner*, 669 F.3d at 815 (citing Wright & Miller § 1778)). Plaintiffs must show that it is possible to use common evidence to prove that Defendants' conduct injured the members of the proposed class. *Id.* To determine whether the liability issues are subject to class-wide proof, the Court examines such factors as the substantive elements of Plaintiffs' claims, the proof necessary for those elements, and the manageability of trial on those issues. *See Farmer v. DirectSat USA, LLC*, No. 08 C 3962, 2010 WL 3927640, at *22 (N.D. Ill. Oct. 4, 2010) (citing *Fletcher v. ZLB Behring LLC.*, 245 F.R.D. 328, 332 (N.D. Ill. 2006).

Plaintiffs rely again on the misguided argument that common issues predominate because the exempt employees' claims rise or fall as a class. (Pls.' Cert. Mem. at 37.) As explained above, however, Plaintiffs will not be able to prove their claims using evidence that is common to the class. The Court will need to conduct individualized inquiries into the facts surrounding each Plaintiff's compensation experiences and the policies and practices of each manager. *See Messner*, 669 F.3d at 818 (a plaintiff's burden on class certification is to demonstrate that the elements of its claim are "capable of proof at trial through evidence that is common to the class rather than individual to its members").

Although in some instances, complaints about a common policy may dominate over individual fact inquiries, based upon the arguments and evidence presented here regarding the localized implementation of policies, the Court cannot "conclude[], however, that the number of people making the same allegations across branches, managers, positions, and time frames has reached a point from which it may be inferred that the common issue of whether a company-wide policy existed to deny overtime will predominate over the variations in methods used to accomplish the alleged policy." *Ross*, 2010 WL 3980113 at *6 (finding predominance even though employees worked in different stores for difference managers when all respondents stated they were denied overtime, with over eighty-five percent indicating this occurred in the same ways and seventy-eight percent reporting that managers relayed that they had been instructed not to pay overtime).

In addition, the fairness and procedural concerns that the Court explains above with respect to the § 216(b) analysis also render class treatment of Plaintiffs' IMWL claim

unmanageable and thus not appropriate for certification under Rule 23(b).  *See* Fed. R. Civ. P. 23(b)(3) (providing that matters pertinent to the Court's Rule 23(b)(3) analysis include "the likely difficulties in managing a class action").

Finally, the diverse issues and factual circumstances facing the potential class members also undercut certification pursuant to Rule 23(b)(2).  "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 131 S. Ct. at 2557; *see also* Fed. R. Civ. P. 23(b)(2).  "Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." (*Id*.)  As discussed above, Belcan may have misclassified each class member as exempt based on a different practice implemented by a different manager in a different location.  These varying practices also would lead to individualized damages.  As a result, Plaintiffs cannot classify the class under Rule 23(b)(2).

For the foregoing reasons, including the lack of predominate common issues, the Court denies Plaintiffs' motion to certify a Rule 23 class.

## III.    The Court Grants Defendant's Motion for Partial Summary Judgment

Although the Court denies the motion for FLSA collective action and Rule 23 class certification, the individual claims of Strait and Brooks remain unaffected as the suit reverts to an individual suit on their behalf.  *See Alvarez,* 605 F.3d at 450; *Franks*, 2012 WL 3903782 at *10 (citing *Espenscheid v. DirectSat USA, LLC,* No. 12-1943, 2012 WL 3156326, at *4 (7th Cir. 2012)).  The Court, therefore, addresses Belcan's motion for partial summary judgment in terms of Strait's and Brooks' claims as individuals.

Belcan moves for summary judgment that there is no dispute that Belcan has paid Strait and Brooks on a salary basis under the FLSA and also moves the Court to grant summary judgment on the Collective and Class Action Allegations in the Complaint. (Def.'s Sum. Jgmt. Mot. at 1, Def.'s Sum. Jgmt. Mem. at 1.) Because the Court denies Plaintiffs' motion for certification, the latter is moot. The Court, therefore, addresses Belcan's motion for summary judgment regarding Strait's and Brooks' individual FLSA claims.

As previously discussed, under the FLSA, an employee is salaried if he or she "regularly receives each pay period. . .a predetermined amount. . .which. . .is not subject to reduction because of variations in the quality or quantity of work performed." 29 C.F.R. § 541.602(a). More specifically, an employee's pay is "subject to" a reduction if the employer has either: (a) "an actual practice of impermissible deductions"; or (b) a "policy creating a likelihood of deduction" that is "clear and particularized" and "effectively communicates that deductions will be made in specified circumstances." *Auer*, 519 U.S. at 461. "The IMWL mirrors the FLSA by expressly exempting employees used in an executive, administrative, or professional capacity as defined by the FLSA and its regulations." *Reich v. Cnty. of Cook*, No. 10 C 3155, 2012 WL 3581169, at *5 (N.D. Ill. Aug. 14, 2012) (citing 820 ILCS 105/4a(2)(E)).

For the following reasons, the Court finds no genuine dispute as to whether Strait and Brooks are salaried employees under the FLSA and IMWL.

## A. Belcan Does Not Have an Actual Practice of Impermissibly Deducting Pay From Brooks or Strait

To show "an actual practice of impermissible deductions," Plaintiffs can establish either that Belcan actually made improper deductions from Strait and Brooks or that Belcan made improper deductions for "employees in the same job classification working for the same

36

managers responsible for the actual improper deductions."  29 C.F.R. § 541.603(b).

There is no dispute that Belcan never subjected Brook's salary to any impermissible deductions.  (Def.'s Sum. Jgmt. Reply at 8; Pls.' Sum. Jgmt. Opp. at 33 ("As to Scott Brooks, Plaintiffs concede. . .that he himself did not have any improper deductions (as it relates to the salary basis test[)].)")

There is also no genuine factual dispute that Belcan ever made any impermissible deductions from Strait.  First, in his deposition, Strait could not point to any specific workweek in which Belcan made a deduction from his salary.  He testified about two circumstances where he thought he might not have received full salary: (1) when he did not have 40 hours of work during his first weeks of employment (Pls.' Sum. Jgmt. Opp. Ex. 17 at 82:8-83:9); and (2) weeks that included a client-based holiday in which he took days off without pay.  (*Id*. at 34:10-35:7.) Belcan's records show that during 2009, Belcan paid Strait his full weekly salary for each week, minus leave without pay days, other than his initial week of employment.  (Undisputed Facts ¶ 11).  The FLSA allows an employer to pay salaried employees proportionally for the amount worked in their initial and terminal weeks.  *See* 29 C.F.R. §541.602(b)(6).

Regarding the client-based holidays, Strait conceded that he chose to take a leave without pay day on such holidays if he did not work.  Specifically, Strait stated "I use my time without pay because I don't want to use my vacation time."  (Pls.' Sum. Jmgt. Opp. Ex. 17 at 34:10-21.) Strait did not testify that anyone at Belcan made him take a day without pay on that holiday. Rather, he explained that he "take[s] time off without pay when [he has] personal matters or obligated places."  (*Id*. at 34:22-35:7.)  Additionally, contrary to Plaintiffs' allegations that Belcan forced Strait, or other exempt employees, not to work on client-based holidays, Strait

testified that he could work at a different location when his usual Caterpillar location closed. (*Id*. at 51:23-52:23.) Strait specifically testified that he could have worked a full week by "working on a Saturday or working at a different location." (Pls.' Sum. Jgmt. Opp. Ex. 17 at 52:14-23.) Moreover, Christopher Meyers, who managed Strait during his entire career at Belcan, submitted uncontested declarations stating that Strait could work during holidays. (Meyers May Decl. ¶¶

3-5; Meyers Decl. ¶¶ 10).[8] As discussed above, Belcan employees could access "closed" sites with manager approval, work remotely, work from another site, work from a Belcan office, or utilize an "overhead" type billing code to account for time on a client-based holiday. Plaintiffs fail to provide any evidence that contradicts Strait's testimony, Meyers' declaration, or the evidence that employees could work on client holidays.

Additionally, testimony by Strait that he believed he would lose pay if he had negative vacation upon termination and that he was paid by the hour is not sufficient to create an issue of fact because "there is no factual support for these conclusory statements in the record and [his] subjective belief is not enough to ward off summary judgment." *Kennedy v. Commonwealth Edison Co.*, 252 F. Supp. 2d 737, 745-46 (C.D. Ill. 2003) aff'd, 410 F.3d 365 (7th Cir. 2005). (finding plaintiffs' belief that they would be paid less if they did not make up their missed time was not sufficient to undermine salary status) (citing *Albiero v. City of Kankakee*, 246 F.3d 927,

---

[8] Strait did testify that "[t]here were times where the facility – [he] was not able to work because of facility closing." (Pls.' Sum. Jmgt. Opp. Ex. 17 at 51:14-15.) Strait explained, however, that he was referring to holidays, such as Martin Luther King Day, when he had the option to work at a different location, or work long days during the rest of the week, or work on Saturday. (*Id*. at 51:16-52:23.) Indeed, Plaintiffs provide no testimony by Strait about any specific day where Belcan docked his pay because he was unable to work.

933 (7th Cir. 2001) (reasoning that self-serving affidavits without factual support in the record do not create a genuine issue of material fact); *see also Zelenika*, No. 09 2946, 2012 WL 3005375, at *11 (N.D. Ill. July 23, 2012) ("Plaintiffs' mere impression that their pay could be docked for such absences, supported only by affidavits lacking necessary foundation, is not sufficient to overcome Defendant's motion for summary judgment") (citing *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006) ("Conclusory allegations and self-serving affidavits, if unsupported by the record, will not preclude summary judgment.").) Plaintiffs' argument that Belcan impermissibly deducted pay from Strait fails as, viewing the evidence in Plaintiffs' favor, there is no dispute that Strait chose to take leave without pay rather than work. *See* 29 C.F.R. § 541.602(b)(1) (stating that an employer may make deductions based on full day of personal leave).

To overcome these deficiencies regarding Brooks and Strait, Plaintiffs argue that Strait and Brooks' actual experience is a "red herring" that is not relevant to the "true" test of whether Belcan subjected them to impermissible deductions. (Pls.' Sum. Jgmt. Opp. at 1.) Plaintiffs correctly note that "one is 'subject to' an impermissible deduction if he is part of a category of individuals for whom the deduction can be made," not just if the company makes an improper deduction from his own salary. (Pls.' Sum. Jgmt. Opp. at 1.) As in their briefs regarding certification, however, Plaintiffs erroneously define the relevant "category" as the proposed class itself, namely all FDTE employees. (*Id.* at 2 ("[T]he answer to the question posed by Belcan's motion for summary judgment - "Are Messrs. Strait and Brooks subject to improper deductions under the salary basis test?"- is that it depends on whether "full-time direct exempt employees" (hereafter "FTDE Employees") are subject to such improper deductions"). Rather, the "category

39

of individuals" relevant to Strait and Belcan is the group of "employees in the same job classification working for the same managers responsible for [any] actual improper deductions." 29 C.F.R. §541.603. Plaintiffs fail, however, to present evidence of the particular managers for whom Strait and Brooks worked in Aurora, Illinois, let alone evidence that such managers made any improper deduction from any employee of the same classification as Strait or Brooks.

In a footnote, Plaintiffs attempt to define "managers responsible" for deductions as the owners and partners of Belcan, since the policies prescribing improper deductions are "companywide policies." (Pls.' Sum. Jgmt. Opp. at 5 n. 6). Plaintiffs do not provide, any affidavits, declarations or documents to show that the owners and partners of Belcan implemented the relevant policies and practices. To the contrary, Belcan has presented uncontested evidence that supervisors, not Belcan owners or partners, approve employee time records. (Wirth Aug. Decl. ¶ 10.) Belcan also offers uncontested evidence that the Belcan employees responsible for decisions about the deductions, as well as for vacation and leave without pay practices, are site managers and supervisors, levels below corporate partners. (Wirth Aug. Decl. ¶¶ 17-19; Pls.' 56.1 Facts, Ex. 10 at BE00060, Ex. 4 at BE00042-43, BE00047-48.) Viewing the record in the light most favorable to Plaintiffs, the Court finds that the "mangers responsible" were the local managers and supervisors, about whom Plaintiffs have not submitted evidence.

**B. Belcan Does Not Have a Clearly Articulated Policy Effectively Communicating a Significant Likelihood of an Improper Deduction from Strait or Brooks' Salary**

As previously discussed, "[t]he phrase 'subject to' does not require proof that an employer has reduced an employee's wages; 'an employment policy that creates a significant

likelihood' of a deduction' will suffice." *Kennedy*, 410 F.3d at 371 (quoting *Auer*, 519 U.S. at 461). Even viewing the evidence in the light most favorable to Plaintiffs, there is no dispute that Belcan has no such policy.

As previously discussed, Belcan has an explicit policy in its Employee Handbook that forbids impermissible deductions from the salaries of FTDE employees, like Strait and Brooks. (*See* Wirth May. Decl. ¶¶ 4-8 and Ex. A at BE00044, Ex. B at BE00049-50, Ex. C at BE00055-56, Ex. D at internal 52.) The policy states that "Belcan prohibits improper pay adjustments to exempt employees' salaries." *Id*. Belcan also has set up its billing system to require each employee to account for 40 hours each week, whether of billable time, vacation time or other time. (Undisputed Resp. Facts ¶ 8; *see also* Pls.' Sum. Jgmt. Opp. Ex. 1, 2011 Wirth Decl. ¶¶ 14-15.) If an employee works only a partial day, for example, he must still account for a full day of time so that the system will make sure he receives his full salary for the week. (Pls.' Sum. Jgmt. Opp. Ex. 1, 2011 Wirth Decl. ¶ 15). Plaintiffs fail to set forth sufficient facts to establish that Strait and Brooks were "subject to" impermissible deductions under any Belcan policy in contravention of the Employee Handbook's prohibition of such deductions.

First, as discussed above, the "furlough adjustment" only applied to employees working for two of Belcan's clients. (Wirth Aug. Decl. ¶ 19; Golden Decl. ¶¶ 8-11; Pls.' Sum. Jmgt. Opp. Ex. 6 at BE19780-81(stating that the furlough policy applies to Belcan's East Hartford and Windsor Lock's Design Centers).) Belcan and Strait both only worked for Caterpillar in Aurora, Illinois, not one of the sites affected by the furlough. (Undisputed facts ¶ 3; Pls.' Sum. Jmgt. Opp. Ex. 6 at BE19780-81.) Thus, no reasonable jury could conclude that Belcan ever subjected Brooks or Strait to impermissible deductions under the temporary, limited "furlough adjustment"

policy.

Second, Plaintiffs have conceded that Belcan's practice of temporarily changing an employees' status from full-time to part-time does not violate the salary basis test in and of itself. (*See* Pls.' Sum. Jgmt. Reply. at 12.) Moreover, there is no evidence that Belcan ever changed the employment status of Brooks or Strait or of any employee of their same classification or that the status-change policy itself resulted in any impermissible deductions. Indeed, the relevant policy does not mention any type of deduction. It merely states that an employment status change from full-time to part-time should be used if an employee "is needed on a weekly basis but not enough hours to sustain 40 hours per week." (Pls.' Sum. Jgmt. Opp. Ex. 8, Handbook Excerpts at internal 49.)

Third, as discussed above, Plaintiffs' arguments that Belcan's practice of paying straight-time overtime when an employee bills less than 40 billable hours in a week shows that Belcan intends to pay employees hourly do not correspond with any policy. Plaintiffs offered no evidence that this practice resulted in any improper deduction, let alone any deduction affecting Strait, Brooks or any employee of their classification.

Fourth, Plaintiffs' arguments regarding the "negative vacation" policy and the "leave without pay" policy fail for many of the reasons outlined in Section I(B)(2)(a) above. Additionally, viewing the evidence in the light most favorable to Plaintiffs, there is no factual dispute that Belcan ever deducted pay from Strait or Brooks as a result of negative vacation. There is also no dispute that Belcan ever forced either Strait or Brooks to take a leave without pay day when there was no work. Indeed, Strait, in his deposition, agreed that in instances where he could not work the required 30 hours to get the additional 10 hours pay in a

"compressed week" it was "not because work wasn't available to [him]." (Hankinson Decl. Ex. 3 at 53:21-54:13.)  Rather, "[it was] because for [his] own personal reasons [he] couldn't get 30 hours in during the week in order to entitle [him] to the 10 hours of bonus holiday [pay]."  *Id.*  Plaintiffs' arguments fatally rely on assumptions about work not being available to employees, which they fail to support with evidence.  Additionally, Belcan's uncontested evidence shows that local managers at different locations have discretion to use and apply the "Compressed Work Week" policy as they see fit.  (*See e.g.*, Wirth May Decl. ¶ 4 and Pls. Sum. Jgmt. Opp. Ex. 8 at internal 37 ("Alterations to the schedule on an employee-by-employee basis and access to the facility on the days the Company is closed are at the discretion of the site General Manager.").  As discussed above, local managers and supervisors also implement the negative vacation policies in different ways.  Plaintiffs have not submitted evidence regarding how Strait's or Brooks' managers implemented these policies which would show Belcan may have subjected them to such policies.

To support these theories, Plaintiffs also cite to a PowerPoint presentation on client-based holidays that was given to the Peoria, Illinois employees, which did not include Strait and Brooks who worked in Aurora.  (Meyers Decl. ¶ 12; Young Decl. ¶ 11.)  Moreover, this policy does not articulate a significant likelihood that a deduction will occur.  It outlines options and that managers and employees have for non-Belcan holidays.  Belcan, therefore, did not subject Strait and Brooks to this policy according to the FLSA.

No reasonable juror, therefore, could find that Belcan did not pay Strait and Brooks on a salary basis under the FLSA.  The Court, therefore, grants Defendants' motion on this issue.

## CONCLUSION

For the reasons set forth above, the Court denies Plaintiffs' motion to certify a collective or class action, denies as moot Defendant's motion for partial summary judgment with respect to the collective and class claims, and grants the remainder of Defendant's motion with respect to Plaintiffs' individual claims under the FLSA .

**DATED: November 29, 2012**                    **ENTERED**

_____

**AMY J. STEEVE**
**United States District Court Judge**